# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
June 12, 2012 Session

## STATE OF TENNESSEE v. HAROLD BERNARD SCHAFFER

**Appeal from the Circuit Court of Dyer County**
**No. C06-299      Lee Moore, Judge**

_____

**No. W2010-01854-CCA-R3-CD  - Filed August 30, 2012**

_____

Harold Bernard Schaffer ("the Defendant") was convicted by a jury of first degree felony murder. The trial court subsequently sentenced the Defendant to life imprisonment. In this direct appeal, the Defendant contends that (1) the trial court erred in denying his motion to dismiss the indictment; (2) the trial court erred in denying his motion to suppress evidence; (3) the State engaged in prosecutorial misconduct during closing argument; and (4) the evidence is not sufficient to support his conviction. After a thorough review of the record and relevant authorities, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Robert C. Brooks, Memphis, Tennessee, for the appellant, Harold Bernard Schaffer.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; C. Phillip Bivens, District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Defendant was indicted in August 2006 for the murder of William Pierce, Jr., committed in 1985. At the Defendant's jury trial, conducted in May 2010, the following proof was adduced:

Agnes Pierce, the victim's widow, testified that her husband, William Pierce, Jr., died on May 17, 1985. At the time of his death, he owned Pierce Discount Center, a building

materials business located on Highway 51 in Dyer County. On the morning of May 17, 1985, the victim left to go to work at the store. According to Ms. Pierce, the victim was alone in the store that morning. She stated that he "carried a lot of cash on him," "as much as five thousand dollars." He would carry the cash in his wallet and in his pocket.

Ms. Pierce identified a photograph of the interior of the store depicting an "L" shaped counter, behind which a door opened into the "paint room." An old non-electric cash register sat on the short arm of the counter, which was perpendicular to the wall in which the door opened into the paint room. The long arm of the counter ran parallel to the wall with the paint room door.

James Ford testified that he was working at Ford Saw Shop, the business next door to the victim's, on May 17, 1985. Ford typically would open his business before the victim arrived for work, and the victim then would come over, drink coffee, and talk with him. As usual, the victim visited with Ford on the morning of May 17. Ford knew that the victim habitually carried cash.

Later that day, someone came to Ford's business and informed Ford's father that he had seen blood on the floor of the victim's business. Ford's father told Ford, and Ford went next door to investigate. He walked in the front door and saw blood on the floor. He followed the blood trail to the victim's body. Ford determined that the victim was dead and contacted law enforcement. Ford stated that he could see fingerprints on the inside of the business's front door and footprints leading out of the door. He described the footprints as "bloody" and stated that they were not his footprints.

Ford identified a photograph of the victim's body. This photograph depicts the victim on the floor of a room in the store with his feet pointed toward the doorway of the room. Ford reviewed the photograph of the store counter and identified the paint room behind it as the room in which he found the victim. Ford stated that the victim normally worked alone. He also stated that he did not see anyone enter the business earlier that day.

David Richardson testified that he was working at Ford's business in May 1985. He knew the victim and was familiar with the victim's business. He followed Ford into the victim's business after the report of blood. He testified, "Jimmy went in first and went in the little paint room and he told me not to go in there because his throat's been cut." Richardson stated that he went far enough into the store to see the victim's feet at the doorway into the paint room. He stated that the only thing he touched was the front door as he entered and exited the store. He testified that "[t]here was blood on the door and footprints, blood, you know, blood footprints going out the door." He also stated that the blood and footprints were already there.

On cross-examination, Richardson stated that he did not know the man who had reported finding blood in the victim's store. Richardson described this man as a middle-aged white man. Richardson had not seen him before and had not seen him since.

Special Agent John Mehr of the Tennessee Bureau of Investigation ("TBI") testified that he reported to the crime scene with TBI Agent Jeff Long. He contacted the TBI Crime Lab to assist in processing the scene. He determined that the person who initially found the blood in the victim's business was Donald Ray Smith. Smith was questioned regarding the crime.

Special Agent Mehr's investigation revealed no eyewitnesses to the crime. Latent fingerprints were recovered from the scene, but no matches were made. Blood was also recovered from the scene. In 1985, however, the TBI crime lab was not conducting DNA analysis. The investigation revealed that the victim's wallet was missing from his person. The wallet was never recovered. Also missing was cash that the victim reportedly had been carrying in his pocket.

In response to the prosecutor's question about whether the investigation revealed any missing checks, Special Agent Mehr testified:

> I actually contacted the bank and we had witnesses that had been out and bought goods from [the victim] and had written checks to him so we contacted the banks to immediately stop payment on those but also secure those checks if they were cashed. And there were none ever cashed.

According to Special Agent Mehr, Dana Sue Jones eventually was developed as a suspect. Later DNA testing of blood found at the scene, however, excluded her. In 2005, the TBI lab obtained a preliminary match from the DNA testing to the Defendant. The Defendant previously had not been a suspect. A known blood sample then was obtained from the Defendant and submitted to the lab for further testing.

Also recovered at the scene was a set of keys found on the cash register at the store. The keys appeared to have blood on them, and there also appeared to be a fingerprint. Special Agent Mehr submitted the keys to be tested for fingerprints. Special Agent Mehr did not request the blood on the keys to be tested until 2005, after the preliminary match to the Defendant had been made.

On cross-examination, Special Agent Mehr explained that the blood sample that was eventually matched to the Defendant was located behind the store counter. He described the location as "right outside the victim."

Robert McFadden testified that he was employed by the TBI in 1985 in latent fingerprint examination. He reported to the crime scene and attempted to lift latent fingerprints. At that time, dusting powder was used in the attempt to lift prints. McFadden was able to lift six latent prints from the scene by this method.

McFadden also attempted to lift fingerprints from the set of keys found on the cash register. He did this at the lab by placing the keys in a "super glue chamber." He was unable to develop any prints from the keys, however.

McFadden compared the latent prints that he was able to develop with the known prints of thirty-five persons, including the victim and the Defendant. No matches were found.

Michael Van Sant testified that he was employed by the TBI in 1985 as a serologist. He reported to the crime scene and collected eleven blood samples from various areas. He labeled these samples 9A through 9K. He stated that he "was trying to find samples of blood away from the body which could have come from somebody else at that time." He identified a photograph of a "drop of what turned out to be blood" next to the victim's foot. He collected evidence from this drop by "mopp[ing]" it with moistened cotton threads and then placing the threads in a Petrie dish. He also collected a carpet knife on which he found a "trace of blood stain." He, however, was unable to determine anything further from the carpet knife.

Van Sant testified that he tested the blood samples he collected for blood type and for certain enzymes. At that time, DNA testing was not available. The tests Van Sant conducted consumed portions of the collected samples. He determined that samples 9A, 9B, 9C, 9F, 9G, 9I, and 9J did not come from the victim. The written report that he generated, dated October 21, 1985, was admitted as an exhibit. It identifies sample 9A as "Sample from behind counter" and sample 9F as "Sample from near victim's left foot."

On cross-examination, Van Sant acknowledged that, "[i]n [his] time, you know, when [he] was doing this [they] could not identify a person using the blood stain." He explained that they could "include" and "exclude" persons as possible donors of a blood stain but they "could never identify." Accordingly, evidence containing both fingerprints and blood would be processed first for fingerprints, as fingerprints were considered more accurate as to a person's identity at the time. Van Sant also acknowledged that there was no way to determine how long blood had been on an object.

On redirect, Van Sant testified that blood degrades when exposed to the environment and that the enzymes and proteins would break down. As to the blood sample collected at the scene that was identified as sample 9A ("Sample from behind counter"), he was able to

determine "the ABO type which is the antigen antibody, the PGM type which is an enzyme and Haptoglobin type which is a serum protein. [He] was able to get two to three different distinct blood types."

Special Agent Chad Johnson of the TBI testified that he was "assigned to the forensics services unit in the serology/DNA section." In 2003, he was able to conduct DNA analysis on blood sample 9A. According to his written report, admitted as an exhibit, the DNA profile developed from sample 9A "was searched against the CODIS database and no matches were detected." Accordingly, the profile was "added to the CODIS database for forensic unknown samples."[1]

In 2005, the CODIS database revealed a match between the DNA profile developed from sample 9A and the Defendant's DNA profile, which was also in CODIS at that time. A known blood standard then was collected from the Defendant. Special Agent Johnson conducted DNA analysis on this known blood standard and compared it to the profile developed from sample 9A. The analyses revealed a "complete match." Special Agent Johnson testified that "the probability of an unrelated individual having the same DNA profile exceeds – exceeds the world population. Which means we wouldn't expect to find that profile anywhere else in the world or in any other individual."

Special Agent Johnson also recovered some blood from the keys collected from the cash register at the crime scene. He performed a DNA analysis on the blood and "then compared that profile from the keys to the victim and [Defendant] and found that there was a mixture of the two." The victim was the "major contributor of the DNA on the keys." He could not exclude the Defendant as the other contributor, but he added that he was "not saying that it's a match" to the Defendant. He explained that his conclusion that the Defendant could not be excluded was based upon a partial match between the Defendant's DNA profile and one of the DNA profiles, which was incomplete, developed from the blood on the keys.

On cross-examination, Special Agent Johnson testified that he had "no idea" how long the blood collected at the crime scene could have been there. He also acknowledged that, at the defense's request, sample 9A was sent to Sorenson Forensics. He stated, "We sent it by the way they asked us to send it to them," adding that it would have been by either FedEx or UPS.

---

[1] "CODIS" is an acronym for the "Combined DNA Index System." It contains DNA profiles of convicted felons. See Tenn. Code Ann. §§ 38-6-113(c) (2010); 40-35-321 (2010); State v. Scarborough, 201 S.W.3d 607, 615-16 (Tenn. 2006).

On redirect, Special Agent Johnson explained that he used half of what remained in sample 9A to conduct his DNA analysis. The other half was retained in the event additional testing was needed. It was this remaining sample that was sent to Sorenson Forensics.

Dr. O'Brien Clary Smith testified that, in 1985, he worked with Dr. James Spencer Bell, who conducted the autopsy on the victim. Dr. Bell died in 1987, but Dr. Smith reviewed the autopsy report that Dr. Bell prepared regarding the victim. Dr. Smith testified that the report indicated that the victim died from "a series of stab wounds and incised wounds." One incision "cut through all of the neck structures, the front of the neck, including the jugular veins, the carotid arteries which are up against the spine as well as the tyroid [sic] gland and part of the windpipe known as the epiglottis." Dr. Smith described this injury as "lethal." He also stated that the immediate effect of this wound would be "a loss of blood pressure to the brain which would very quickly produce unconsciousness."

Dr. Smith also testified that the victim had suffered "abrasions and incisions on his hands." He added that "injuries to the hands are often interpreted in forensics as being defensive injuries which means a person may be trying to protect their body from some object and that hand will take the injury instead of the person receiving the blow to the chest, for instance." Dr. Smith cautioned, however, that the term "defensive injuries" did not indicate that the pathologist knew, in fact, how the injuries actually were inflicted.

On cross-examination, Dr. Smith acknowledged that the weapon could have been a carpet knife.

The State rested after Dr. Smith's testimony.

The defense called Scott Walton, a forensic DNA analyst with Sorenson Forensics. Walton testified that his office received a sample from the TBI lab. This sample was tested for the presence of human blood. The result was "[i]nconclusive for the presence of human blood." Mr. Walton then attempted to extract DNA from the sample. While he was able to extract some DNA, there was "not enough data to run any sort of statistical analysis." He stated that "the DNA was of insufficient quality" and explained that there could be many reasons for his inconclusive results, including degradation resulting from exposure to sunlight and exposure to warm temperatures. He added that, when his lab received the sample, "it was in a container that was not conducive to long term storage and that could be one cause" of its degradation.

On cross-examination, Mr. Walton acknowledged that the DNA testing he performed did indicate that the sample contained human DNA.

On the basis of this proof, the jury convicted the Defendant of first degree felony murder committed in the perpetration of a robbery.[2] The trial court subsequently sentenced the Defendant to life imprisonment.

In this direct appeal, the Defendant avers that the trial court should have dismissed the indictment because it does not contain all of the essential elements of the offense; that the trial court erred in denying the Defendant's motion to suppress; that the prosecution committed reversible error during closing argument; and that the evidence is not sufficient to support his conviction.

**Analysis**

*Sufficiency of Indictment*

Prior to trial, the defense filed a motion to dismiss the indictment as being insufficient for failure to allege an essential element of the offense, to wit, the Defendant's culpable mental state. The trial court denied the motion, finding that the indictment "meets the requirements of T.C.A. § 40-13-202 as would have been applicable for the offense in 1985, and further that the mental state of the defendant could logically be inferred from the conduct alleged in the indictment." The Defendant alleges that the trial court committed reversible error in this ruling.

The indictment in this case provides as follows:

> The grand jurors of Dyer County, Tennessee, duly empaneled and sworn upon their oath, present that Harold Bernard Schaffer, on or about May 17, 1985 in Dyer County, Tennessee, and before the finding of this indictment, did unlawfully kill William Pierce, Jr. in the perpetration of a robbery or theft, in violation of T.C.A. §39-13-202, and against the peace and dignity of the State of Tennessee.

The Defendant contends that this indictment is fatally flawed because it contains no allegation of the culpable mens rea element. We disagree.

In 1985, the offense of first degree felony murder was defined as follows: "Every murder . . . committed in the perpetration of, or attempt to perpetrate, any murder in the first degree, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful

---

[2] Although the indictment alleged that the murder was committed in the perpetration of "robbery or theft," the trial court charged the jury only on the predicate offense of robbery.

throwing, placing or discharging of a destructive device or bomb, is murder in the first degree." Tenn. Code Ann. § 39-2-202(a) (1982). This Court repeatedly has recognized that the crime of felony murder as defined in 1985 did not contain a mens rea element. See, e.g., John H. Williams, Jr. v. Kevin Myers, No. M2002-00855-CCA-R3-CO, 2002 WL 31852857, at *3 (Tenn. Crim. App. Dec. 20, 2002) ("The pre-1989 felony murder statute did not require a separate mens rea for the killing."); James E. Martin v. Howard Carlton, No. 03C01-9807-CR-00253, 1999 WL 360147, at *1 (Tenn. Crim. App. June 7, 1999) (recognizing that the crime of felony murder prior to the 1989 revisions did not contain a culpable mental state); State v. Frank Whitmore, No. 03C01-9404-CR-00141, 1997 WL 334904, at *12 (Tenn. Crim. App. June 19, 1997) ("Before the 1989 Sentencing Act, felony murder lacked any mens rea requirement, establishing strict liability for the crime of first degree murder when a murder was committed during the perpetration of or an attempt to perpetrate an enumerated offense."). Accordingly, the Defendant is entitled to no relief on this issue.

*Motion to Suppress*

Prior to trial, the defense filed a motion to suppress "all evidence resulting, or flowing from the DNA tests performed on him pursuant to the search warrant issued September 5, 2005." As grounds for the motion, the defense contended that "the affidavit in support of the search warrant contained statements which were false, willfully or recklessly made, and without which the affidavit failed to establish probable cause." Specifically, the motion refers to the following averments in the affidavit:[3]

> 1. On or about May 17, 1985, a criminal investigation into the homicide death of William Pierce was begun.
>
> 2. When the crime scene was processed, a bodily fluid sample was recovered from the victim's left foot.
>
> 3. Forensic testing revealed that the bodily fluid sample did not belong to the victim.

---

[3] The State points out in its brief that the record on appeal does not include either the affidavit in support of the search warrant or the search warrant. We note, however, that the record before us contains a certified statement from the circuit court clerk of Dyer County, Tennessee, that the clerk "doesn't have [the] requested documents, search warrant and affidavit." At the motion to suppress, however, both Special Agent Mehr and Special Agent Nathan Bishop, who prepared the affidavit, acknowledged that the facts set forth in the motion to suppress were accurate. The trial court also set forth these same averments in its order denying the Defendant's motion. Therefore, we have relied upon the Defendant's motion to suppress for the language at issue.

4. Deoxyribonucleic Acid (DNA) was isolated from the sample and subsequently entered into the Combined DNA Index System (CODIS).

5. Harold Bernard Schaffer (Black, Male, DOB, 7/28/1964) is incarcerated at the West Tennessee State Penitentiary and a sample of his DNA was obtained and entered into the CODIS Databases.

6. CODIS blends forensic science and computer technology into an effective tool for solving violent crimes. A CODIS enables federal, state, and local crime labs to exchange and compare DNA profiles electronically, thereby linking crimes to each other and to convicted offenders.

7. In a[n] Official Serology/DNA Report, dated February 8, 2005, notification was made that the DNA, isolated from the bodily fluid sample found on the victim's left foot, was searched against CODIS Databases and a match was detected.

8. The DNA, isolated from the bodily fluid sample found on the victim's left foot, was matched to a known standard from Harold Bernard Shaffer (Black, Male, DOB, 7/28/1964).

9. To confirm the match, a known blood standard must be obtained and submitted for DNA testing.

In his motion to suppress, the Defendant pointed out that the affidavit identified the wrong blood sample as providing a match to the Defendant via the CODIS database. The affidavit refers to the relevant blood sample as the one having been collected "from the victim's left foot," whereas the blood sample was, in fact, the one collected from behind the store counter. That is, the affidavit confused the descriptions of samples 9A, collected from behind the store counter, and 9F, collected from near the victim's left foot. It was on the basis of this affidavit that the court issued a search warrant requiring the Defendant to provide a blood sample to be compared to the DNA results obtained from sample 9A.

At the hearing on the motion to suppress, Special Agent Mehr testified that numerous blood samples were recovered at the crime scene and forwarded to the TBI Crime Lab that same day. These samples were identified by numbers and letters. A report set forth the locations from which each sample was recovered. Sample 9A was recovered behind the counter at the store. Sample 9F was recovered near the victim's left foot. Both samples were

later determined to consist of human blood, and DNA analyses were eventually conducted on the samples. The DNA from sample 9F matched the victim's DNA.[4]

Special Agent Mehr explained that CODIS is a nationwide database containing DNA samples obtained from incarcerated individuals. He periodically requested that the DNA obtained from the crime scene be compared to the CODIS database. In 2005, Special Agent Mehr received a TBI lab report indicating that a match had been obtained between the DNA in sample 9A and the Defendant's DNA profile in the CODIS database. Upon being notified of the CODIS match, Special Agent Mehr requested Special Agent Nathan Bishop to prepare a search warrant in order to obtain a blood sample from the Defendant for confirmation testing. Upon reviewing the motion to suppress and its recitation of the averments contained in the affidavit prepared by Special Agent Bishop in support of the search warrant, Special Agent Mehr acknowledged that the relevant blood sample was misidentified as having originated from the victim's left foot instead of from behind the counter.

Special Agent Nathan Bishop of the TBI testified that, at the request of Special Agent Mehr, he prepared an affidavit in order to obtain a search warrant in connection with the Pierce murder. He obtained his information from Special Agent Mehr and "an old lab report." He testified that, in preparing his affidavit, he "inadvertently referred to Exhibit 9F when it should have been 9A." He acknowledged that his textual description in the affidavit identified the location of the blood generating the DNA match to the Defendant as from or on the victim's left foot. He also acknowledged that the location from which the blood sample was actually recovered was behind the counter.

The trial court denied the defense motion in a comprehensive written order, finding and concluding as follows:

> There is no question that Agent Bishop referred to Exhibit 9F when it should have been Exhibit 9A in preparing his affidavit upon which the search warrant was based. He indicated that the mistake was an inadvertent mistake. There was no evidence to suggest anything other than an inadvertent mistake. There is no evidence to suggest that the mistake was intentionally made with the intent to deceive the Court or that the statement was recklessly made . . . .

---

[4] We recognize that Special Agent Mehr's testimony on this point differs from Van Sant's testimony at the trial. The lab report to which Special Agent Mehr was referring, prepared in February 2005 and a copy of which was admitted at the suppression hearing, provided that a partial DNA profile was obtained from exhibit 9F "which matched [the victim's blood standard] at the following short tandem repeat (STR) loci: amelogenin." The record does not contain an explanation of whether the results reflected on the report and Van Sant's conclusion that 9F did not come from the victim nevertheless may be consistent given the differences in technology used in testing in 1985 and 2005.

State v. Yeomans, 10 S.W.3d 293 (Tenn. Crim. App. 1999) [provides] that negligence or innocent mistakes are insufficient to invalidate a search warrant where probable cause was established. Although the exhibit samples were incorrectly stated, one sample at the scene was matched through "CODIS" to the defendant. Even though the matched sample was behind the counter rather than by the victim's left foot, probable cause was still established. There is no basis for suppressing the DNA evidence. Defendant's Motion to Suppress is denied.

In reviewing this ruling, we are bound by the trial court's findings of fact unless the evidence in the record preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. Because the State prevailed in the trial court, it "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Id. We review the trial court's application of the law to the facts de novo, however, with no presumption of correctness. State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010).

Initially, we note that the Defendant failed to raise this issue in either his motion for new trial or his amended motion for new trial. Therefore, this issue has been waived. See Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."); see also State v. Dooley, 29 S.W.3d 542, 548 (Tenn. Crim. App. 2000). Moreover, we agree with the State that the Defendant is not entitled to relief under the doctrine of plain error.

This Court will not grant relief for plain error unless all of the following five criteria are established: (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the defendant was adversely affected; (4) the defendant did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. See State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted). We hold that the trial court's denial of the Defendant's motion to suppress did not constitute error. Accordingly, there has been no breach of any unequivocal rule of law.

This Court has recognized that an affidavit in support of a search warrant that is sufficient on its face may be impeached only by showing "'(1) a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause,'" or "'(2) a false statement, essential to the establishment of probable cause, recklessly made.'"

State v. Yeomans, 10 S.W.3d 293, 297 (Tenn. Crim. App. 1999) (quoting State v. Little, 560 S.W.2d 403, 407 (Tenn. 1978)). "Recklessness may be established by showing that a statement was false when made and that [the] affiant did not have reasonable grounds for believing it, at that time." Little, 560 S.W.2d at 407.

Here, the trial court accredited Special Agent Bishop's testimony that his misidentification of the location of the blood which gave rise to a CODIS match with the Defendant was "inadvertent." There is no contrary proof in the record. Certainly, there is no proof in the record that Special Agent Bishop's misidentification was made with an intent to deceive the court into issuing a search warrant. Moreover, even if the trial court should have determined that Special Agent Bishop's misidentification was reckless, the misidentification was not essential to the establishment of probable cause.

In order to establish probable cause for the issuance of a search warrant, an affidavit must set forth "reasonable grounds for suspicion, supported by circumstances indicative of an illegal act." State v. Stevens, 989 S.W.2d 290, 293 (Tenn. 1999) (citing State v. Johnson, 854 S.W.2d 897, 899 (Tenn. Crim. App. 1993)). In this case, probable cause was established upon the match between the Defendant's DNA profile in CODIS and the DNA profile generated from a blood sample collected at the scene of the crime. The sample that generated the match was collected from an area behind the store counter. The affidavit misidentified this sample as having been collected from the victim's foot. We fail to discern how the "victim's foot" sample was more likely to establish probable cause than was the "behind the counter" sample. Both samples were collected on the day of the crime. Both samples were collected from the interior of the store. Both samples were collected from areas which would not typically be frequented by store customers. Both samples were collected from an area near the victim.

The Defendant argues in his brief to this Court that, "[h]ad the affidavit correctly stated that the only blood sample [that] was identified with [the Defendant was] that taken from behind the counter in the store, which was a distance away from the slain body, the affidavit would not have established a reasonable basis to conclude that the defendant was the assailant." We disagree. In this case, probable cause was based upon a DNA match between blood found at the scene of the crime and the Defendant's DNA sample in CODIS. The precise location of the blood at the scene of the crime was not necessary for a finding of probable cause. The Defendant is entitled to no relief on this basis.

*Prosecutor's Closing Argument*

The Defendant also contends that he is entitled to a new trial on the basis of prosecutorial misconduct during closing argument. Initially, we note that lawyers have "great leeway in arguing before a jury," and we will reverse a trial court's "broad discretion"

-12-

in controlling argument only upon an abuse of discretion. <u>State v. Thomas</u>, 158 S.W.3d 361, app. 412-13 (Tenn. 2005). Moreover, even if a prosecutor engages in misconduct during argument, the error is reversible only if it affected the outcome of the trial to the defendant's prejudice. <u>See</u> <u>State v. Bane</u>, 57 S.W.3d 411, 425 (Tenn. 2001). Thus, to demonstrate that he is entitled to relief on appeal, the Defendant must "show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." <u>State v. Farmer</u>, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996) (citing <u>Harrington v. State</u>, 385 S.W.2d 758, 759 (Tenn. 1965)).

In this case, defense counsel asserted the following during closing argument:

We know that that trail of blood, those footprints, prints on the door, the bloody prints, the blood on the handle we know beyond a reasonable doubt that belonged to the person who committed this crime, but, but the TBI expert was quite honest when I asked him well what about this sample that was behind the counter? Can you tell how old that was? He said can't tell. Could it have been days? Can't tell. Weeks? Can't tell. Months? Can't tell. I asked him could it have been years old, gave exactly the same answer. Can't tell. There is no evidence whatsoever as to how old that one supposedly pristine sample was. That could have been there for years.

. . . .

There is no evidence that [the Defendant] was ever even at [the victim's] store except this one drop of blood which is kind of questionable. But all that would even prove is that he was there at some time within years of the offense.

. . . .

Even assuming that this blood drop is [the Defendant's] the only relationship it has to the crime is that it was at the scene. There is no evidence as to how long it had been there. It could have been years just as easily as it could have been left at the time of the crime.

In rebuttal closing argument, the prosecutor asserted the following:

Have you heard any proof that that blood got there at some other time? Have you? No. You're to base your decision on what you hear –

The defense lawyer objected, stating (before the jury) that the prosecutor was "shifting the burden of proof to the [D]efendant. The burden of proof is on the State and always there."

A bench conference ensued, during which the prosecutor contended that his argument was "in response to" the defense argument. The trial court responded, "It is, but you can't shift the burden of proof either." The prosecutor replied, "No sir. I'm saying the proof has to come from the witness stand." The trial court stated, "You're getting perilously close to that so be careful as you go from there." The bench conference then concluded, and the prosecutor resumed argument with, "Yes, sir. You're to be bound by the proof that you hear from this witness stand. From this witness stand." The prosecutor then continued in a different vein.

The Defendant contends that the trial court erred when it "denied" his objection and that his constitutional rights were violated by the prosecutor's argument. The State disagrees.

Initially, we note that the trial court did not deny defense counsel's objection. Rather, the trial court issued a stern warning to the prosecutor. We also note that the trial court did not issue a curative instruction to the jury; however, defense counsel did not request such an instruction. Moreover, the defense objection contained the essence of what the trial court would have told the jury, had a curative instruction been requested: that the burden of proof remained on the State and that the Defendant bore no burden of proof.[5] We also note that, in its charge to the jury, the trial court instructed the jurors as follows:

> Our law presumes that a defendant is innocent. This presumption of innocence remains with the defendant throughout every stage of the trial. This presumption of innocence is not overcome unless you the jury after considering all the evidence are convinced beyond a reasonable doubt that the defendant is guilty.
>
> The State has the burden of proving guilt beyond a reasonable doubt. This burden never does shift. The burden remains on the State throughout the trial of the case. In other words, a defendant is not required to prove innocence. . . .
>
> The State has the burden of proving all the elements of the crime beyond a reasonable doubt and that the crime was committed by the defendant in Dyer County, Tennessee before the return of the indictment.

---

[5] We do not imply that an objection carries the same weight as an instruction from the trial court. We simply observe that the jury was alerted to the defense's concern by the objection. The merit of the objection was addressed adequately by the trial court's subsequent jury charge.

We presume that a jury follows its instructions, a presumption that may be overcome only upon clear and convincing evidence to the contrary. See State v. Vanzant, 659 S.W.2d 816, 819 (Tenn. Crim. App. 1983).

We hold that the Defendant is not entitled to relief on this issue. "It has long been established that a district attorney general may argue that the state's evidence is uncontradicted." State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999). In essence, that is what the prosecutor was arguing in this case: he was asking the jury to consider that it had not heard an alternative theory for the presence of the Defendant's blood at the scene of the crime, other than the State's theory that he committed the crime. Moreover, the prosecutor's remarks were not directed at the Defendant's decision to not testify, as, conceivably, someone else could have testified as to the Defendant's presence at the victim's store on a date preceding the murder. See State v. Devon O'Neal Wiggins, No. W2009-02095-CCA-R3CD, 2011 WL 1223410, at *10 (Tenn. Crim. App. Mar. 30, 2011), perm. app. denied (Tenn. July 15, 2011).

We acknowledge that the proof in this case was not overwhelming. Nevertheless, we hold that the Defendant has failed to demonstrate that the trial court abused its discretion in its handling of the Defendant's objection or that the prosecutor's argument tainted the jury's verdict. Accordingly, the Defendant is entitled to no relief on this issue.[6]

### Sufficiency of the Evidence

In his final issue, the Defendant challenges the sufficiency of the evidence underlying his conviction of first degree felony murder. Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the

---

[6] In its argument on this issue, the State alleges in its brief that the keys proffered by the State in its case in chief were "used to unlock a register from which cash and checks were stolen." The trial transcript does not contain any evidence that the keys were used to unlock the register or that cash and checks were missing from the register.

-15-

strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our supreme court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

As set forth above, the crime of first degree felony murder was defined in 1985 as follows: "Every murder . . . committed in the perpetration of, or attempt to perpetrate, any murder in the first degree, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb, is murder in the first degree." Tenn. Code Ann. § 39-2-202(a) (1982). In this case, the jury was charged on the elements of this offense as follows:

> A person commits murder in the first degree if he kills any person during the perpetration of or attempt to perpetrate a robbery. If you find the defendant guilty of murder in the first degree the State must have proven beyond a reasonable doubt the existence of the following essential elements: 1) That the defendant unlawfully killed the alleged victim; 2) that the killing was committed during the alleged perpetration of a robbery, that is that the killing was closely connected to the alleged robbery and was not a separate, distinct and independent event; and 3) that the defendant specifically intended to commit the alleged robbery.

The proof is more than sufficient to support the jury's conclusion that a killing was committed during the perpetration of a robbery. The victim was found dead in his store with his throat cut. The victim's wallet was missing, as was the cash he routinely carried in his pockets. The proof that the Defendant challenges is his identity as the perpetrator.

As previously acknowledged, the proof in this case is not overwhelming. However, under our standard of review, we hold that it is sufficient to establish the Defendant as the perpetrator of the felony murder of the victim. Dr. Smith testified that the victim had been killed by the infliction of stab and incised wounds. He opined that a carpet knife could have been the weapon. The victim had suffered cuts and abrasions to his hands, leading to the reasonable inference that the victim had put up a struggle. It is also reasonable to infer that an attacker who is wielding a knife may himself suffer bleeding wounds when his victim responds with physical resistance. Blood recovered from the crime scene on the day of the crime was determined by DNA analysis to belong to someone other than the victim.

Eventually, a DNA match was found in CODIS, indicating that the Defendant was the source of the blood. DNA analysis of a known standard subsequently obtained from the Defendant placed the Defendant at the scene of the crime. The blood sample generating the match was found behind the counter of the store, between the victim and the cash register. Blood on keys found on the cash register also was subjected to DNA analysis. The analysis indicated that the Defendant could not be excluded as one of the contributors of the blood found on the keys. The reasonable inference is that, after killing the victim and thereby sustaining bleeding wounds, the perpetrator sought access to the contents of the cash register. By doing so, the perpetrator had the opportunity to leave his own blood in the area near the cash register, including on the floor behind the counter on which the cash register sat and the cash register keys were found. In 1985, Van Sant was able to obtain enzymes and proteins from the blood sample collected from behind the counter. His testimony that the enzymes and proteins contained in blood break down when exposed to the environment supports the inference that the blood behind the counter was fresh when it was collected at the crime scene.

While certainly not overwhelming, this evidence is sufficient to place the Defendant at the crime scene, and the circumstances of the victim's murder are sufficient to explain the presence of the Defendant's blood at the crime scene as having resulted from the Defendant committing the crime. Accordingly, the Defendant is entitled to no relief on this issue.

## **Conclusion**

For the foregoing reasons, we affirm the judgment of the trial court.

_____
JEFFREY S. BIVINS, JUDGE